IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JULIE LINDERMAN, | ) | Case No. 1:16-cv-944 |
| | ) | |
| Plaintiff, | ) | JUDGE DONALD C. NUGENT |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| COMMISSIONER OF SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | **REPORT AND RECOMMENDATION** |
| | ) | |

## I.      Introduction

Plaintiff Julie Linderman, seeks judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her application for disability insurance benefits ("DIB") under Title II of the Social Security Act.  This matter is before the court pursuant to 42 U.S.C. §1383(c)(3), 42 U.S.C. §405(g) and Local Rule 72.2(b).

Because the ALJ who considered Linderman's claims committed no error of law and issued a decision that was supported by substantial evidence, I recommend that the final decision of the Commissioner be **AFFIRMED**.

## II.      Procedural History

Linderman filed an application for DIB on November 19, 2012, alleging a disability onset date of August 17, 2012.  (Tr. 94-95, 180)  Linderman claimed she was disabled because of her diabetes, anxiety, depression, fibromyalgia, arthritis, costochondritis, sinus tachycardia, blurred

vision, migraines, and pressure in the brain.  (Tr. 94)  Linderman's application was denied

initially on March 4, 2013 (Tr. 93-104) and upon reconsideration on October 8, 2013.  (Tr. 105-

118)  Thereafter, Linderman requested a hearing on June 12, 2013.  (Tr. 129-30)  Administrative

Law Judge Joseph Vallowe heard Linderman's case on February 2, 2015 (32-92), and he denied

Linderman's claim for benefits that same month (10-31).  The Appeals Council denied review of

that decision on March 1, 2016, rendering the ALJ's February 27, 2015 decision the final

decision of the Commissioner.  (Tr. 1-3)

### III.    Evidence

#### A.    Personal, Educational, and Vocational Evidence

Linderman was 43 years old on the date of the hearing.  (Tr. 37, 180)  She has a college

education.  (Tr. 40)  Linderman's medical problems seemed to begin in the spring of 2012.

Before that, she worked as a data entry clerk (sedentary, semi-skilled).  (Tr. 25).  Her earnings

progressively increased year to year for fifteen years.  (Tr. 182)

#### B.    Medical Evidence

On May 4, 2012, Linderman presented to Parma Community General Hospital for chest

discomfort and palpitations.  (Tr. 336)  Linderman reported relatively normal exercise capacity,

no prior cardiac events, and no syncope.  (Id.)  Upon examination, she was found to be stable but

somewhat tachycardic with heart rates in the 80 to 100 range even at rest.  (Tr. 337)  Nelson

Mostow, M.D. opined that Linderman's palpitations sounded like benign premature ventricular

contractions and that she had a "relative tachycardia."  (Id.)  Linderman was released after an

examination revealed stable vital signs, regular heart sounds, and 3 EKGs showed

negative/nonischemic results.  (Tr. 341)  Two days later Linderman went to the emergency room

2

of the Cleveland Clinic complaining of palpitations, headache, lightheadedness, nausea, and abdominal pain. (Tr. 308-10). Linderman's heart rate and rhythm were regular, but she was found to be dehydrated, had poorly controlled diabetes, and heart palpitations. (Tr. 310)

Between June and October 2012, Linderman received treatments from primary care physician, Avi Marocco, M.D., for fibromyalgia, dizziness, persistent migraines, and anxiety. (Tr. 449-50, 453-55, 463) Because Marocco felt Linderman might have been suffering from major depression he prescribed Savella and recommended psychotherapy. (Tr. 454) Later, she took prescribed Xanax for anxiety and was referred for a full psychiatric evaluation. (Tr. 452)

On October 7, 2012, Linderman went to the emergency room at Marymount Hospital complaining of chronic headache, chest pain, and arm pain. (Tr. 408-09) Linderman was mildly tachycardic at discharge. (Tr. 410) Thomas M. Wido, M.D., opined that Linderman's mildly elevated heart rate was secondary to underlying anxiety. (Id.)

Linderman began treating with cardiologist Caroline M. Casserly, M.D. on October 22, 2012. (Tr. 425) Dr. Casserly's records contain Linderman's report that her heart rate had been ranging up to 120 beats per minute for several months. (Id.) Dr. Casserly diagnosed tachycardia and ordered placement of a 24-hour Holter monitor. (Id.) Dr. Casserly interpreted the results of the Holter monitor testing as follows "sinus rhythm with frequent sinus tachycardia, heart rate 79-159 bpm [with an average heart rate of 105 bpm], a rare supraventricular ectopic in isolation, rare uniform ventricular ectopics in isolation and fusion complex." (Tr. 429) Dr. Casserly also noted that Linderman's diary entries during the Holter test contained complaints of being out of breath, dizziness, lightheadedness, palpitations, and migraine. (Id.) Dr. Casserly stated that the diary entry symptoms were all "associated with sinus rhythm and sinus tachycardia." (Id.) It was further noted that a Dr. Baron had prescribed Propranolol to treat Linderman's headaches

3

and tachycardia.  (Tr. 432)  Linderman was also referred to a syncope clinic.  (Id.)  None of Dr. Casserly's medical records indicated Linderman was experiencing episodes of syncope or near-syncope.

On November 5, 2012, Linderman met with psychiatrist Justin Havemann, M.D., for an evaluation.  (Tr. 760-64)  Dr. Havemann noted that Linderman was regularly seeing Kathy Balcerzak, a social worker in his office, for psychotherapy.  (Tr. 762)  Linderman was diagnosed with moderate, recurrent, major depressive disorder; generalized anxiety disorder; and somatoform disorders NOS.[1]  (Id.)  Dr. Havemann discontinued Cymbalta and started Linderman on Prozac.  (Id.)  Later that day, Linderman went to the emergency room at Marymount Hospital complaining of transient vertigo.  (Tr. 751)  After normal examinations and a normal EKG, Linderman was sent home and asked to return for an MRI the following day.  (Id.)

Linderman returned to Dr. Havemann for a psychiatric evaluation on November 21, 2012.  She told Dr. Havemann that her prescribed Propranolol was helping her palpitations and tachycardia.  (Tr. 765-66)  She also said her anxiety was better.  (Tr. 766)  Dr. Havemann recommended that Linderman continue Prozac and psychotherapy, and return in a month.  (Tr. 767)

On December 12, 2012, Linderman underwent tilt table testing, which showed an abnormal response "due to late Accentuated Postural Tachycardia…in the set-up of essentially normal blood pressure response to head-up-tilt/HUT."  (Tr. 512, 592)  It was reported that the heart rate findings were consistent with "circulatory imbalance vs. cardiovascular neuro-automic

---

[1] There was also a note next to somatoform disorders, which stated "Rule-out:  Somatoform Disorders (somatization d/o)."  (Tr. 762, 767).

imbalance and is among the factors that can predispose to symptoms of orthostatic intolerance."
(Tr. 592)  It was also noted that clinical correlation was needed.  (Id.)

In January 2013, Linderman underwent migraine infusion therapy.  (Tr. 503-07)  That
same month, Linderman returned to Dr. Havemann reporting that she was feeling a little better
but that she had four panic attacks since she was last seen.  (Tr. 771)  Dr. Havemann suspected
that Linderman's tachycardia was contributing to her anxiety.  (Id.) He increased Linderman's
Prozac dosing and started her on Lyrica.  (Tr. 772)  The next month, Havemann noted a mild
decrement in Linderman's mood and anxiety but opined that it was largely situational and related
to her concern over not having any income.  (Tr. 776)

On March 13, 2013, Linderman followed up with her cardiologist, Dr. Casserly.  At that
time, it was reported that Linderman was suffering from "dysautonomia (tachycardia, dizziness,
POTS)."  (Tr. 586)  It was noted that she continued to experience migraines, dizziness, and
occasional tachycardia but that it was improved on Propranolol.  (Id., 589)  Dr. Casserly stated
that she discussed the possibility of adding Midodrine to Linderman's pharmaceutical regimen
but since Linderman "***has never had syncope*** and did not drop her BP with the tilt table test," Dr.
Casserly thought that the Linderman "[w]ould not see a benefit at this point."  (Tr. 589 emphasis
added)  Two days later, Linderman presented to Yuebing Li, M.D., complaining of dizziness.
(Tr. 511)  Dr. Li concluded that Linderman "barely meets the diagnosis of postural orthostatic
tachycardia syndrome."  (Tr. 515)  She stated that Linderman was on a beta-blocker for
tachycardia and Wellbutrin ("another medication that is often prescribed for orthostatic
intolerance."), and did not see the value of adding additional medications at that time.  (Id.)  She
recommended that Linderman resume a daily exercise program and felt that "the least helpful
strategy is to sit and rest all days (sic) long."  (Id.)

On March 20, 2013, Dr. Marocco issued a handwritten statement on a prescription pad that Linderman was disabled due to medical and psychiatric conditions.  (Tr. 479)  In a treatment note from that same day, Dr. Marocco reported that Linderman experienced headaches, dizziness, and worsening vertigo.  (Tr. 573)  Linderman's cardiovascular exam that day was normal.  (Tr. 574)

In April 2013, Linderman was evaluated by psychologist Steven J. Krause, Ph.D., M.B.A.  Linderman reported headaches, increased anxiety, and panic attacks.  (Tr. 521-22)  Dr. Krause diagnosed chronic daily headaches, undifferentiated somatoform disorder, panic attacks, and fibromyalgia.  (Tr. 522)  Dr. Krause recommended Linderman be seen in the chronic pain rehabilitation program.  (Id.)

On May 1, 2013, Linderman reported that she was still having problems with balance, dizziness, and that vertical movements were difficult.  (Tr. 570)  In July 2013, she saw Dr. Baron because of persistent headache.  (Tr. 496)  Dr. Baron noted a "growing multitude of other symptoms" including back pain, insomnia, swollen numb hands, worsening urge incontinence, itching all over, groin lymph nodes aching, intermittent parethesias in the arms and feet, and dizzy spells.  (Tr. 495)  Linderman also told Dr. Baron she was having heart-racing episodes several times a day.  She admitted that Propranolol helped reduce those symptoms.  (Id.)  Dr. Baron diagnosed Linderman with new daily persistent headache and noted that her depression and anxiety could be contributing to her extensive symptomatology.  (Id.)  That same sentiment was echoed shortly thereafter by Adrienne Boissy, M.D. M.A., who opined that Linderman's depression and anxiety were impacting her symptomatology, as well as the possibility of fibromyalgia.  (Tr. 544)

In July 2013, Linderman returned to Dr. Casserly for follow-up care for chest pain and palpitations.  (Tr. 592)  Linderman reported that after beginning Wellbutrin for panic attacks, her palpitations have worsened.  (Id.)  She stated that Propranolol has helped but she still has palpitations.  (Id.)  Dr. Casserly suggested Linderman increase her Propranolol dosage to 60 mg three times a day.  (Tr. 595)  In December 2013, it was reported that Linderman's Propranolol dosage was up to 90 mg twice a day.  (Tr. 609)

In March 2014, an EKG was normal.  (Tr. 674)  Linderman reported occasional palpitations at that time but that the Propranolol helped.  (Id.)  In April 2014, Linderman reported at the time that her dizziness "comes and goes" and caused her to fall over.  (Tr. 655)  In October 2014, Linderman was diagnosed with sinusitis.  (Tr. 797)  Later that day, she went to the emergency room for headaches and dizziness and stated that she believed sinusitis was not the proper diagnosis.  (Id., 801)  Linderman reported no near-syncope or syncope.  (Tr. 797)  She was diagnosed with migraine headache and vertigo.  (Tr. 805-06)

### C.      Opinion Evidence

#### 1.      Psychological Evaluation – Dr. Havemann & Ms. Balcerzak

On May 20, 2013, Dr. Havemann and social worker, Ms. Balcerzak issued an assessment of Linderman's mental capacity.  In that assessment, it was opined that Linderman was significantly limited in maintaining attention and concentration, working around others without being distracted or distracting, dealing with work stress, and completing a normal workday or workweek without interruption form psychologically based symptoms.  (Tr. 480-81)  The assessment listed constant severe headaches, dizziness, falling episodes, panic attacks, depression, and impaired concentration as symptoms, which supported the assessment.  (Tr. 481)

#### 2.      Physical Evaluation – Karin Kleppel, P.T.

7

On July 7, 2013, Karin Kleppel, P.T., completed a functional capacity evaluation of Linderman.  (Tr. 482-93)  At the end of the physical testing, Ms. Kleppel determined that Linderman could perform at a light level of work, but noted that there were safety concerns due to balance issues.  (Tr. 483-84)

### 3.    Consultative Examination – Dr. Koricke

On December 12, 2013, Linderman underwent a psychiatric evaluation consultation conducted by Deborah Ann Koricke, Ph.D.  (Tr. 469-76)  Linderman reported that she suffered from depression for many years but it had never stopped her from working.  (Tr. 475)  She stated that if her physical symptoms were under control, she felt her "symptoms are sufficiently controlled psychiatrically that she should be able to go back to work."  (Id.)  Dr. Koricke opined that Linderman could understand, remember, and follow all instructions, and that any memory difficulties were quite mild.  (Tr. 475)  Dr. Koricke further opined that Linderman had no limitations in her ability to respond appropriately to work pressures; to respond to supervision and coworkers; or to maintain attention, concentration, persistence, and pace to perform simple and multi-step tasks.  (Tr. 475-76)

### 4.    State Agency Consultant – Dr. Manos

On October 3, 2013, state agency consultant Diane Manos, M.D. reviewed Linderman's claim file and completed a residual functional capacity assessment.  (Tr. 106-18)  Dr. Manos considered the following listings but found Linderman did not meet the requirements:  Listing 1.04 (spine disorders), Listing 12.04 (affective disorders), and Listing 12.06 (anxiety disorders). (Tr. 1130)  Dr. Manos opined that Linderman could occasionally lift 50 pounds; frequently lift 25 pounds; stand/walk and sit 6 hours in an 8-hour workday.  (Tr. 114)  Dr. Manos further opined that Linderman could never climb ropes/ladders/scaffolds and could frequently stoop and

crouch due to headaches and associated dizziness.  (Tr. 115)  Dr. Manos ultimately determined that Linderman was not disabled and could perform past relevant work in Data Quality as previously performed.  (Tr. 117)

     **5.**       **State Agency Consultant – Dr. Lewis**

Bradley J. Lewis, M.D., state agency consultant, next reviewed Linderman's claim file on January 2, 2013.  (Tr. 100-04)  As with Dr. Manos, Dr. Lewis reviewed Listings 1.04, 12.04, and 12.06 and determined that Linderman did not meet them.  (Tr. 100)  Dr. Lewis also confirmed the same functional limitations of Dr. Manos.  (Tr. 101-02)  Ultimately, Dr. Lewis determined that Linderman was not disabled and could perform past relevant work in Data Quality as previously performed.  (Tr. 103)

     **D.**       **Testimonial Evidence**

     **1.**       **Linderman's Testimony**

Linderman testified at the administrative hearing.  Linderman's counsel initially provided opening remarks and conceded that Linderman did not contend that she met a Listing.  (Tr. 37)  Instead, Linderman's counsel stated that Linderman's "conditions combine[d] and preclude[d] sustainability of SGA [substantial gainful activity]."  (Tr. 36)  Linderman testified that she lived alone in a second floor apartment.  (Tr. 37-38)  Linderman stated that she possessed a driver's license and had no physical restrictions on her ability to drive.  (Tr. 39-40)  Linderman testified that she last worked in August 2012 for JP Morgan Chase Bank performing administrative work.  (Tr. 40-41)  When asked what she believed prevented her from working, Linderman testified that her chronic migraines were the biggest factor.  (Tr. 44)  She stated that dizziness, anxiety, and panic attacks were also factors.  (Tr. 44)

Linderman asserted that she only slept 2-3 hours each night and had constant migraines. (Tr. 44-45)  She stated that she could only take Tylenol and was allergic to all other medications. (Tr. 47)  She also stated that lying down daily helped.  (Tr. 47-48)  She further testified that bright lights bothered her.  (Tr. 48)  The ALJ wondered whether Linderman had ever tried tinted eyeglasses; Linderman said she had not.  (Tr. 48-49)  Linderman stated her intermittent dizziness caused her to fall over each morning and sometimes to run into objects.  (Tr. 49-50)  Linderman testified that after about 30 seconds of standing she got wobbly.  (Tr. 51)  The ALJ then pointed out that Linderman did not have a cane with her at the hearing.  (Id.)  Linderman testified that she did own a cane and used it 2-3 days a week.  (Tr. 51-52)  She admitted that the cane was not prescribed for her but stated that Dr. Marocco said it was a "very good idea."  (Tr. 52) Linderman also testified that she recently purchased a handlebar attachment for the shower.  (Id.)

Next, Linderman testified regarding her mental health limitations.  She contended that she suffered from five panic attacks each week.  (Tr. 53)  She said the panic attacks lasted 10 minutes and caused her heart to race.  (Id.)  Linderman testified that she found some relief from medication but that her panic attacks had not completely ceased.  (Tr. 54)  Linderman stated that she took medication for her dizziness when it got severe enough.  (Tr. 55)  Linderman further testified that she suffered from chronic diarrhea and incontinence.  (Id.)

Linderman later testified about her tachycardia.  She stated that she takes Propranolol for the condition.  (Tr. 57)  She explained that the medication "definitely helps," and that her condition will deteriorate if she is late in taking a dose.  (Tr. 57)  She stated that she started experiencing tachycardia while still working four years earlier.  (Tr. 57-58)

Linderman testified that she suffered from uncontrolled diabetes because she was allergic to insulin.  (Tr. 58-59)  The ALJ then asked if any doctors had put Linderman on any restrictions,

10

to which she replied "No."  (Tr. 59-60)  Linderman testified that she was recently diagnosed with asthma and thought that her breathing problems could also be work preclusive.  (Tr. 63)  Linderman further testified that she could not walk a block, stand for even a minute, or sit for more than 1-1.5 hours before having to get up and move.  (Tr. 63-64)

Linderman testified that she had serious problems with her short-term memory and concentration.  (Tr. 66-67)  She explained how she independently engaged in activities of daily living.  (Tr. 68, 71)  She also grocery shopped a couple of times a week, dined out about once a week, and occasionally attended concerts or fairs.  (Tr. 70).  Her residence is a second floor walk-up and she traversed the stairs daily to access the apartment.  (Tr. 38)  However, she stated that about 5 days a month she was unable to function.  (Tr. 75)

<h3 align="center">2.    Vocational Expert's Testimony</h3>

Vocational Expert Georgia Gunther ("VE") also testified at Linderman's hearing.  (Tr. 80-90)  The VE testified that Linderman's prior data entry clerk position was semi-skilled and performed at a sedentary level.  (Tr. 81-82)  The ALJ posed four hypothetical questions to the VE, asking whether an individual with Linderman's age, education, past work experience, and various work restrictions would be able to perform Linderman's past relevant work.  (Tr. 82-86)  In the first hypothetical, the ALJ asked the VE to imagine the following work restrictions: medium level of exertion; never climb ropes/ladders/scaffolds; frequent crouching and stooping; and no exposure to hazards.  (Tr. 82)  The VE testified that the hypothetical individual could perform Linderman's past work as actually performed and as generally performed in the national economy.  (Id.)

## IV.    Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the

existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(a).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[2]….

42 U.S.C. § 423(d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

---

[2] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country."  42 U.S.C. § 423 (d)(2)(A).

20 C.F.R. §§ 404.1520, 416.920; *Bowen v. Yuckert,* 482 U.S. 137, 140-142 (1987).  Under this

sequential analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v.*

*Comm'r of Soc. Sec.* 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner

at Step Five to establish whether the claimant has the RFC and vocational factors to perform

work available in the national economy.  *Id.*


**V.**     **The ALJ's Decision**

The ALJ issued a decision on February 27, 2015.  A summary of his findings are as

follows:

1.  Linderman meets the insured status requirements of the Social Security Act
    through September 30, 2018.  (Tr. 15)

2.  Linderman had not engaged in substantial gainful activity August 17, 2012,
    the alleged onset date.  (Tr. 15)

3.  Linderman has the following severe impairments:  asthma, sinus tachycardia,
    migraine headaches, diabetes mellitus, and degenerative disc disease/arthritis.
    (Tr. 15)

4.  Linderman does not have an impairment or combination of impairments that
    meets or medically equals the severity of one of the listed impairments.  (Tr.
    19)

5.  Linderman has the residual functional capacity ("RFC") to sedentary work
    except, in exertional limitations, she can lift/carry ten pounds occasionally and
    less than ten pounds frequently, and she can sit for six hours and stand/walk for
    two hours in an eight-hour day.  In postural limitations, she can never climb
    ladders and scaffolds, and she can frequently stoop and crouch.   In
    environmental limitations, she must never be exposed to unprotected heights,
    moving mechanical parts, or operate a motor vehicle.  (Tr. 19)

6.  Linderman is capable of performing past relevant work as a data entry clerk.
    This work does not require the performance of work-related activities
    precluded by the claimant's RFC.  (Tr. 25)

Based on these findings, the ALJ determined that Linderman had not been under a

disability since August 17, 2012, through the date of the decision.  (Tr. 25)

## VI.    Law & Analysis

### A.    Standard of Review

This court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied. *See Elam v. Comm'r of Soc. Sec.,* 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker,* 708 F.2d  1058, 1059 (6th Cir. 1983).  Substantial evidence has been defined as "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.,* 25 F.3d 284, 286 (6th Cir. 1994).

The Act provides that "the findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. §§ 405(g) and 1383(c)(3). The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton v. Halter,* 246 F.3d 762, 772-3 (6th Cir. 2001) (*citing Mullen v. Bowen,* 800 F.2d 535,545 (6th Cir. 1986); *see also Her v. Comm'r of Soc. Sec.,* 203 F.3d 288, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached." *See Key v. Callahan,* 109 F.3d 270, 273 (6th Cir. 1997).  This is so because there is a "zone of choice" within which the

14

Commissioner can act, without the fear of court interference. *Mullen,* 800 F.2d at 545 (*citing Baker v. Heckler,* 730 F.2d 1147, 1150 (8th Cir. 1984).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the court must determine whether proper legal standards were applied. If not, reversal is required. *See e.g. White v. Comm'r of Soc. Sec.* 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue,* 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (*quoting Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996); *accord Shrader v. Astrue,* No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue,* No. 1:10-cv-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue,* No. 2:10-CV-017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010).

### B.    Linderman's Arguments

Linderman argues that the ALJ's decision requires reversal for three reasons. First, Linderman contends that the ALJ failed to consider Listing 4.05. Next, Linderman argues that that the ALJ failed to provide good reasons for discounting her treating physician's opinion.

15

Third, Linderman contends that the ALJ's RFC did not match the VE hypothetical and, thus, it was improper to rely on the VE's testimony in the disability determination.

### 1.    Linderman does not raise a substantial question that she meets Listing 4.05

First, Linderman asserts that the ALJ committed reversible error at Step Three of the five-step disability evaluation process by failing to consider whether her sinus tachycardia met the requirements of Listing 4.05.  ECF Doc. No. 13, Page ID# 948.  The Commissioner argues that Linderman has not raised a substantial question as to whether she meets Listing 4.05 because she has not presented medical findings demonstrating that she meets or equals the listing criteria. ECF Doc. No. 51, Page ID# 982-83.  The Commissioner's argument is well taken.

At Step Three of the disability evaluation process, a claimant will be found disabled if she has an impairment or combination of impairments that meets or medically equals one of the listings in the Listing of Impairments.  20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); *Turner v. Comm'r of Soc. Sec*., 381 Fed. Appx. 488, 491 (6th Cir. 2010).  The listings streamline the disability decision-making process by identifying individuals who are unable to perform any gainful activity regardless of age, education, or work experience.  *Sullivan v. Zebley*, 493 U.S. 521, 532 (1990) (citing 20 C.F.R. § 416.925(a)).  Each listing specifies the objective medical and other findings needed to satisfy the criteria of that listing.  20 C.F.R. § 404.1525(c)(3), 416.925(c)(3).  A claimant must satisfy all of the criteria to "meet" the Listing.  Id.; *Rabbers v. Comm'r of Soc. Sec*., 582 F.3d 647, 652 (6th Cir. 2009).

The relevant Social Security regulations require the ALJ to find a claimant disabled if she meets a listing.  20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); *Sullivan v. Zebley,* 493 U.S. 521, 532, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990).  However, neither the regulations nor the Sixth Circuit require the ALJ to "address every listing….especially when the claimant does not raise

16

the listing before the ALJ." *Sheeks,* 544 Fed.Appx. at 641; *see also Kornecky v. Comm'r of Soc. Sec.,* 167 Fed.Appx. 496, 507–08 (6th Cir.2006) ("it is well settled that[ ] 'an ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party.' ") (*quoting Loral Defense Sys.-Akron v. N.L.R.B.,* 200 F.3d 436, 453 (6th Cir.1999)).

The ALJ's decision does not discuss Listing 4.05.  As pointed out by the Commissioner, Linderman not only did not mention Listing 4.05 at the hearing, her counsel conceded that this was not a listing case.  (Tr. 37)  However, the Commissioner does not claim that Linderman forfeited that argument and because "a potential forfeiture may itself be forfeited," this court may still decide whether the listing applies to this case.  *Sheeks v. Comm'r of Soc. Sec. Admin.,* 544 F. App'x 639, 641 (6th Cir. 2013) *citing United States v. Turner,* 602 F.3d 778, 783 (6th Cir. 2010).  *See also Clifton v. Colvin*, No. 1:13CV1895, 2014 WL 2946655, at *11 (N.D. Ohio July 1, 2014) (finding that the claimant's listing argument was not forfeited although the Commissioner noted "in passing," but did not expressly argue, that the claimant had not raised the listing at the administrative level).

In cases such as this, the Sixth Circuit has held that remand is only appropriate when the record raises a "substantial question" over whether a claimant meets a Listing.  *Smith-Johnson v. Comm'r of Soc. Sec*., 579 F. App'x 426, 432 (6th Cir. 2014); *Sheeks v. Comm'r of Soc. Sec.,* 544 F. App'x 639, 641–42 (6th Cir.2013) (*citing Abbot v. Sullivan*, 905 F.2d 918, 925 (6th Cir.1990)); *See also Hobbs v. Comm'r of Soc. Sec.,* No. 1:13 CV 1411, 2014 WL 4545921, at *4 (N.D. Ohio Sept. 12, 2014) ("Two decisions of the Sixth Circuit …clarify the holding in Abbott to now be that an ALJ is required to consider Listing 12.05 only where the record raises a substantial question as to whether [the claimant] could qualify as disabled under that

17

listing.")(internal quotations omitted).  A claimant must do more than point to evidence on which

the ALJ could have based his finding in order to raise a "substantial question" as to whether he

has satisfied a listing.  *Sheeks*, 544 Fed.Appx. at 641–42 (finding claimant did not raise a

substantial question as to satisfying the listing for intellectual disability where the ALJ's finding

of borderline intellectual functioning simply left open the question of whether he meets a listing

and where claimant pointed to only a few pieces of tenuous evidence addressing the listing).

Rather, the claimant must point to specific evidence that demonstrates she reasonably could meet

or equal every requirement of the listing.  *See Sullivan*, 493 U.S. at 530, 110 S.Ct. 885 ("For a

claimant to show that his impairment matches a listing, it must meet all of the specified medical

criteria.  An impairment that manifests only some of the criteria, no matter how severely, does

not qualify."); *Foster v. Halter*, 279 F.3d 348, 354–55 (6th Cir. 2001).  Absent such evidence,

the ALJ does not commit reversible error by failing to evaluate a listing at Step Three.

At the time of Linderman's ALJ decision, Listing 4.05 provided:[3]

> 4.05 Recurrent arrhythmias, not related to reversible causes, such as electrolyte abnormalities or digitalis glycoside or antiarrhythmic drug toxicity, resulting in uncontrolled (see 4.00A3f), recurrent (see 4.00A3c) episodes of cardiac syncope or near syncope (see 4.00F3b), despite prescribed treatment (see 4.00B3 if there is no prescribed treatment), and documented by resting or ambulatory (Holter) electrocardiography, or by other appropriate medically acceptable testing, coincident with the occurrence of syncope or near syncope (see 4.00F3c).

20 C.F.R. § Pt. 404, Subpt. P, App. 1 § 4.05.  The definition section of the listing includes

tachycardia as an arrhythmia.  20 C.F.R. Part 404, Subpart P, Appendix 1, Listing 4.00(F)(1).

Here, the ALJ found that Linderman suffered from the severe impairment of sinus tachycardia

(Tr.15).

---

[3] Federal courts will review the Commissioner's final decisions using the rule that was in effect at the time we issued the decision.  See https://www.federalregister.gov/documents/2016/07/01/2016-15306/revised-medical-criteria-for-evaluating-neurological-disorders(last visited December 14, 2016).

"The requirements of section 4.05 are met where a claimant has a recurrent arrhythmia that is not fully controlled and that results in uncontrolled recurrent episodes of syncope or near syncope, and there is a documented association between the recurrent arrhythmia and the syncope or near syncope." *Robertson v. Comm'r of Soc. Sec.*, 513 F. App'x 439, 440–41 (6th Cir. 2013) *citing* 20 C.F.R. pt. 404, subpt. P, app. 1, §§ 4.00F(3)(a), (c), 4.05.  "Syncope is defined as a loss of consciousness or a faint, while near syncope is defined as a period of altered consciousness." *Id. citing* 20 C.F.R. pt. 404, subpt. P, app. 1, § 4.00F(3)(b) (internal quotations omitted).  Near syncope is not "merely a feeling of lightheadedness, momentary weakness, or dizziness." 20 C.F.R. § Pt. 404, Subpt. P, App. 1 §4.00F(3)(b).

The Commissioner contends that Linderman does not meet Listing 4.05 because there is no record evidence demonstrating syncope or near syncope.  ECF Doc. No. 15, Page ID# 983. Listing 4.05 requires appropriate medical testing documenting that the tachycardia was "coincident with the occurrence of syncope or near syncope."  The ALJ's decision is somewhat unclear with regard to whether Linderman ever experienced any instances of syncope.[4] Notwithstanding the ALJ's inconsistency, Linderman does not provide any evidence of syncope or near syncope "coincident with" medically appropriate testing documenting her tachycardia.

In fact, Linderman concedes this issue in her brief.  She states that her Holter testing resulted in "dizziness, lightheadedness, wooziness" not syncope.  ECF Doc. No. 13, Page ID# 950.  She also notes that syncope "did not occur" on her tilt table testing.  Id.  Linderman's own statements are consistent with the medical evidence of record.  For example, in March 2013 Linderman's cardiologist stated that Linderman "has never had syncope and did not drop her BP

---

[4] In one part of the decision, the ALJ notes that Linderman's May 2012 cardiac consultation showed no history of syncope.  (Tr. 22)  In another part of the decision the ALJ determined that Linderman was limited in her ability to stoop, crouch, climb ladders, and perform other activities because of her lightheadedness, dizziness, unsteadiness, and *syncope episodes*.  (Tr. 21)

with the tilt table test."  (Tr. 589)  Thus, Linderman does not raise a substantial question whether she meets Listing 4.05 because she fails to show that she experienced syncope or near syncope in conjunction with an arrhythmia episode documented by appropriate medical testing.  *See O'Connor v. Astrue*, No. CIV.A. 10-0093 DMC, 2011 WL 1321674, at *12–13 (D.N.J. Mar. 30, 2011), *aff'd sub nom. O'Connor v. Comm'r Soc. Sec.*, 466 F. App'x 96 (3d Cir. 2012) ["[B]ecause Plaintiff failed to show that his impairments satisfied all of the required criteria under the Listing 4.05 (specifically, that he experienced syncope or near syncope in conjunction with his arrhythmia episodes), there is substantial evidence to support ALJ Andres's conclusion that Plaintiff did not meet or equal…Listing 4.05."]

Next Linderman argues that, even if she does not meet a listing, the ALJ should have adequately explained his findings that Linderman's impairments did not *equal* a listed impairment.  More specifically, Linderman argues that the ALJ should have considered whether her tachycardia equaled the Listing 4.05 when considered in combination with migraines, somatoform disorder, and panic attacks.  Id.  Linderman also appears to argue that her diagnosis of "pre-syncope" should have been considered.  Id.  Finally, Linderman argues that despite some improvement in her tachycardia from Propranolol she continued to report dizziness and falling over.  Id.

If a claimant's impairment does not meet the criteria specified in the listings, she is still disabled if the impairment medically equals a listed impairment.  20 C.F.R. § 404.1520(d).  If a claimant has more than one impairment, the Commissioner must determine "whether the combination of [the] impairments is medically equal to any listed impairment."  20 C.F.R. § 404.1526(a).  Nevertheless, the mere accumulation of a number of impairments does not itself establish medical equivalency.  Titles II & Xvi: The Sequential Evaluation Process, SSR 82-56

(S.S.A. 1982).  "Any decision as to whether an individual's impairment or impairments are

medically the equivalent of a listed impairment must be based on medical evidence demonstrated

by medically acceptable clinical and laboratory diagnostic techniques, including consideration of

a medical judgment about medical equivalence furnished by one or more physicians designated

by the Secretary." Titles II & Xvi: The Sequential Evaluation Process, SSR 86-8 (S.S.A. 1986);

See also 20 C.F.R. § 416.926(b); SSR 82-56 ("In no case are symptoms alone a sufficient basis

for establishing the presence of a physical or mental impairment.")  Linderman fails to identify

any objective medical evidence supporting her medical equivalence argument.  Thus, this issue

does not require remand.  *Sullivan v. Zebley,* 493 U.S. 521, 110 S.Ct. 885, 891, 107 L.Ed.2d 967

(1990) (claimant "must prove that [her] impairments either match or amount to the medical

equivalent of *all* of the specified medical criteria.")[5]

Based on all of the above, substantial evidence supports the ALJ's conclusion that

Linderman did not meet or equal Listing 4.05.[6]

---

[5] Furthermore, responsibility for deciding medical equivalence rests with the ALJ.  20 C.F.R. § 404.1526(e).  In determining medical equivalence, it is proper for an ALJ to rely upon a state agency medical consultant's opinion that a claimant's impairment(s) does not meet a Listing.  Social Security Ruling 96–6p, 1996 WL 374180, * 3 (July 2, 1996).  In addition to other recorded findings by medical consultants, the signature of a State agency medical or psychological consultant on a Disability Determination and Transmittal Form ensures that a physician or psychologist designated by the Commissioner has considered the question of medical equivalence.  Id.; (Tr. 23-24; 94-104; 106-118).  Here several agency consultants reviewed and signed disability determination forms indicating that claimant did not meet or equal a listing.  (Tr. 94-118)  The undersigned finds that the ALJ's reliance upon such opinions was proper under the regulations and Linderman has failed to demonstrate otherwise.  See 20 C.F.R. § 404.1526(e); SSR Ruling 96–6p, 1996 WL 374180 at * 3.  *Lawrence v. Astrue,* No. 5:11-CV-2684, 2012 WL 6813602, at *9 (N.D. Ohio Dec. 3, 2012), *report and recommendation adopted,* No. 5:11 CV 2684, 2013 WL 103121 (N.D. Ohio Jan. 7, 2013).

[6] The Commissioner makes an additional argument that Linderman does not meet Listing 4.05 because the listing requires her recurrent arrhythmia to persist at listing-level severity despite prescribed treatment.  ECF Doc. No. 15, Page ID# 984.  See 20 C.F.R. § Pt. 404, Subpt. P, App. 1 § 4.00F(3)(a) ("We will use 4.05 when you have arrhythmias that are not fully controlled by medication…and you have uncontrolled recurrent episodes of syncope or near syncope.  If your arrhythmias are controlled, we will evaluate your underlying heart disease using the appropriate listing.")  The Commissioner asserts that the evidence demonstrates that Linderman's tachycardia was improved while on medication (i.e., Propranolol).  ECF

2.      **The ALJ provided good reasons for discounting the treating physician opinion**

Linderman next argues that the ALJ's failed to give appropriate weight to her treating physician, Dr. Havemann, and did not provide good reasons for assigning "little weight" to Dr. Havemann's assessment.  ECF Doc. No. 13, Page ID# 951-57.  The Commissioner counters that the ALJ provided the following good reasons for assigning little weight to Dr. Havemann's opinion:  (1) Linderman's statements to the consultative psychological examiner contradicted Dr. Havemann's findings; (2) Dr. Havemann's opinion was based on Linderman's allegations of debilitating mental symptoms – which the ALJ found "not credible;" and (3) objective clinical findings failed to corroborate the existence of significant mental dysfunction.  ECF Doc. No. 15, Page ID# 986-87.

Social Security Administration regulations dictate how medical opinions must be weighed.  20 C.F.R. § 404.1527(c).  In general, the regulations require that an opinion from a medical source who has examined a claimant be given more weight than opinions from a source who has not performed an examination; and an opinion from a medical source who regularly treats the claimant is afforded more weight than that from a source who has examined the claimant but does not have an ongoing treatment relationship.  *Id.* § 404.1502, 404.1527(c)(1)&(2).  *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 375 (6th Cir. 2013).  In

Doc. No. 15, Page ID#984.  Conversely, Linderman asserts that although her recurrent arrhythmia improved initially on Propranolol she continued to have problems despite the medication.  ECF Doc. 13, Page ID# 950.  Since the parties dispute this evidence and this issue was not addressed by the ALJ, it is not permissible for this court to weigh the evidence.  The Commissioner's argument engages in impermissible post-hoc rationalization and will not be addressed.  *See SEC v. Chenery Corp.*, 332 U.S. 194 (1947) (holding that a reviewing court must judge the propriety of an administrative decision on the grounds invoked by the agency.); *See also Meech v. Comm'r of Soc. Sec.*, No. 1:12CV2134, 2013 WL 5406743, at *2 (N.D. Ohio Sept. 25, 2013); *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir.2005) (a reviewing court "may not decide facts anew, reweigh the evidence, or substitute [its] judgment for that of the Commissioner.").

other words, "[t]he regulations provide progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker." *Id. citing* Social Security Rule No. 96–6p, 1996 WL 374180, at \*2 (July 2, 1996).

If treating source opinions are (1) "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "not inconsistent with the other substantial evidence in [the] case record," then they must receive "controlling" weight. 20 C.F.R. §404.1527(d)(2); *White v. Comm'r of Soc. Sec*., 572 F.3d 272, 286 (6th Cir. 2009). If the treating source opinion is not given controlling weight, then the ALJ must apply several factors in determining the weight to give the opinion including: the length, frequency, nature, and extent of the treatment relationship; supportability; consistency; specialization; and other factors which support or contradict the opinion. 20 C.F.R. § 404.1527(c)(2). These reasons must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Gayheart,* 710 F.3d at 376 (quoting SSR 96–2p, 1996 WL 374188 at \*5 (SSA)). These requirements are referred to as the treating physician rule.

"The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases, particularly in situations where a claimant knows that his physician has deemed him disabled and therefore might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied." *Wilson v. Comm'r of Soc. Sec.,* 378 F.3d 541, 544–45 (6th Cir. 2004) (citing *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir.1999)) (internal quotations omitted). Because the reason-giving requirement exists to "ensur[e] that each denied claimant receives fair process," the Sixth Circuit has held that an ALJ's "failure to follow the procedural requirement of identifying the reasons for

23

discounting the opinions and for explaining precisely how those reasons affected the weight"
given "*denotes a lack of substantial evidence,* even where the conclusion of the ALJ may be
justified based upon the record." *Id.* (quoting *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 243
(6th Cir.2007) (emphasis added)).  However, although the regulations instruct an ALJ to consider
various factors, they expressly require only that the ALJ's decision include "good reasons ... for
the weight ... give[n] [to the] treating source's opinion"—not an exhaustive factor-by-factor
analysis. *Francis v. Comm'r Soc. Sec. Admin.*, 414 F. App'x 802, 804 (6th Cir. 2011) (quoting
20 C.F.R. § 404.1527(d)(2).

Dr. Havemann provided a medical source statement ("MSS") in 2013 opining that
Linderman could rarely maintain attention and concentration; maintain regular attendance or
punctuality; function independently without redirection; work closely to others without being
distracted; deal with work stress; complete a normal workday and workweek without interruption
from psychologically based symptoms or perform at a consistent pace without an unreasonable
number of rest periods.  (Tr. 480)  Dr. Havemann also opined that Linderman could only
occasionally respond appropriately to changes in a routine setting; understand, remember, and
carry out complex or non-complex work instructions; socialize; behave in an emotionally stable
manner; mange funds; or leave home on her own.  (Tr. 480-81)  In support of his findings, Dr.
Havemann stated, "patient has constant severe headache; dizziness; falling episodes – panic
attacks; depressed, impaired concentration."  (Tr. 481)  The ALJ afforded "little weight" to Dr.
Havemann's 2013 MSS, stating:

> The statements the claimant made to Dr. Koricke during the consultative examination
> about mental issues contradict Dr. Havermann's [sic] opinion, and his opinion is
> grounded exclusively on the claimant's subjective complaints of headaches, dizziness,
> etc.  Accordingly, I give his opinion little weight.

(Tr. 24).

Initially, a treating physician's opinion must be afforded controlling weight if it is (1) "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "not inconsistent with the other substantial evidence in [the] case record."  Here, the ALJ expressly asserted that Dr. Havemann's opinion was not supported by clinical and laboratory diagnostic technique (e.g., "grounded *exclusively* on the claimant's subjective complaints...") and not inconsistent with other substantial evidence (e.g., "statements made…during the consultative examination…contradict Dr. [Havemann's] opinion.").  Thus, the ALJ was not obligated to give controlling weight to the opinion.  Next, it must be determined whether the ALJ provided "good reasons" for affording the MSS less than controlling weight.

The ALJ asserted that he gave little weight Dr. Havemann's opinion because it was solely grounded on Linderman's subjective complaints.  The ALJ also discounted the opinion because Linderman's statements to Dr. Koricke during the consultative examination contradicted Dr. Havemann's opinion.  With regard to Linderman's subjective complaints, the ALJ determined that Linderman's statements concerning the intensity, persistence, and limiting effects of her impairments were not entirely credible and that there was "no objective evidence to support work preclusive limitations."  (Tr. 20)  In fact, the ALJ stated that no mental limitations were warranted and noted that her clinicians found no objective mental health concerns upon examination.  (Tr. 22)  The ALJ cited to the several treatment notes in the record from Dr. Havemann.  (Id.)  As the ALJ pointed out, the treatment notes found that Linderman was alert and oriented with normal mood, affect, eye contact, memory, attention, and fund of knowledge, and that she was cooperative, smiling, neatly dressed, and well groomed.  (Tr. 22, 750-779)

25

The ALJ also found that Dr. Havemann's opinion was contradicted by Linderman's statements during a consultative examination with Dr. Koricke.  As Dr. Koricke stated the following, in pertinent part:

> Ms. Linderman indicated that she has suffered from depression for many years, but it has never stopped her from working.  She said that if she were physically better, she feels her symptoms are sufficiently controlled psychiatrically that she should be able to go back to work…She has never had any difficulties on a job.  She has a long history of depression and anxiety, but says it is her physical difficulties that are stopping her from working at this time…The claimant is able to perform day to day tasks independently consistently.  She bathes daily.  She cooks and maintains her own apartment.  She socializes appropriately.  The claimant said it is simply her physical restrictions that make her very tired and have a detrimental effect on her persistence and ability to do several tasks….The claimant presented no history of difficulties getting along with others in work-related settings.  In fact, she said she "loved all my boss (sic) and coworkers"…The claimant said it is only her physical restrictions that have stopped her from working.  She said she has no psychiatric issues that are of such a degree that she could not work appropriately."

(Tr. 475-76)  Based on the above, it was not just Dr. Koricke's opinion that starkly contradicted Dr. Havemann's opinion, but it was also Linderman's own admissions to Dr. Koricke about her condition that contradicted Dr. Havemann's opinions.  The problem with the contradiction in Linderman's reported symptoms is magnified when considered in combination with the ALJ's finding that Dr. Havemann's opinion was based solely on Linderman's self-reports.  An ALJ may properly discount a treating physician's opinion when it is inconsistent with other substantial evidence in the record.  *Gaskin v. Comm'r of Soc. Sec.,* 280 F. App'x 472, 475 (6th Cir. 2008); *See also Warner v. Comm'r of Soc. Sec.,* 375 F.3d 387, 390 (6th Cir.2004) (finding that the ALJ properly rejected portions of the treating physician's opinion because it was inconsistent with other evidence in the record); *Martin v. Comm'r of Soc. Sec.,* 170 Fed.Appx. 369, 372–73 (6th Cir.2006) (finding no error in the ALJ's failure to defer to the treating physician's opinion because it was contradicted by other physicians and the information in the claimant's medical records).

For all of the reasons mentioned above, substantial evidence in the record supports the ALJ's determination to afford Dr. Havemann's opinion "little weight."  The ALJ reasonably found that Dr. Havemann's opinion was not well supported and was inconsistent with other evidence in the record.  The undersigned finds that the ALJ provided "good reasons" for providing less weight to Dr. Havemann's opinion, and supported those reasons by substantial evidence in the record.

### 3.   ALJ did not err by relying on the VE's answer to  hypothetical that did not precisely match the RFC

Finally, Linderman contends that the ALJ committed reversible error when he determined that she could perform her past relevant work based upon a RFC that was not communicated to the VE.  ECF Doc. No. 13, Page ID# 957-58.  The ALJ determined that Linderman could return to her past work as a data entry clerk based on the testimony of the VE.  The ALJ stated that

> [h]aving been asked to assume a person with the same age, education, and work experience as the claimant, and a [RFC] as stated in the finding immediately prior to this one, the vocational expert testified that such an individual would be able to perform the data entry clerk work as actually and generally performed in the regional and national economy.

(Tr. 25)  However, the ALJ's statement is not entirely accurate.  The VE was not asked a hypothetical question that completely matched the RFC.  Despite the lack of consistency between the RFC and the hypothetical, the Commissioner contends that the ALJ's decision should be upheld because the hypothetical was more restrictive than the RFC.  ECF Doc. No. 15, Page ID# 989-90.

The Commissioner contends that the "final hypothetical [posed to the VE] *most closely* reflected Plaintiff's RFC."  ECF Doc. No. 15, Page ID# 989 (emphasis added).  Although the fourth and final hypothetical was similar to the RFC in that both were set at the sedentary exertional level, the undersigned finds that the first hypothetical most closely reflected the RFC.

27

In the first hypothetical, the ALJ asked the VE to assume an individual of Linderman's same age, education, and past jobs with a medium level of exertion who could never climb ropes, ladders, and scaffolds; could frequently crouch and stoop; and could not be exposed to hazards such as unprotected heights, moving mechanical parts, or operating a motor vehicle.  (Tr. 82)  The VE testified that the hypothetical individual could perform Linderman's past work.  (Id.)  The RFC in the ALJ's decision almost identically matches the limitations communicated to the VE in the first hypothetical; except for the RFC changed the exertional level from medium work to sedentary.[7]  (Tr. 19)

It is not reversible error for the ALJ to rely on the VE's response to a hypothetical question that differs from the RFC when the RFC is more favorable to plaintiff than the hypothetical.  In this case, the only difference between the hypothetical question and the RFC was the exertional level of the work.  The hypothetical set a medium exertional level, whereas the RFC set a sedentary exertional level.  The ALJ's chosen RFC is plainly more favorable to Linderman than the one included in the hypotheticals posed to the VE.  Moreover, if a person can perform medium work than they can also perform sedentary work.[8]  20 C.F.R. §

---

[7] The RFC also did not include a limitation regarding climbing ropes.  It can be inferred that someone who cannot climb ladders or scaffolds also could not climb ropes.  Linderman does not contend that this is a reversible distinction.  Therefore, the ALJ's failure to include this limitation in the RFC was not material.  *See Greene v. Astrue*, 2012 WL 1248977 (D.Mass.  April 12, 2012) ("An administrative law judge's failure to use in his RFC assessment the exact language of a posed hypothetical does not automatically render his findings erroneous"; rather, any such "difference must be material in order to potentially constitute an error.")

[8] The RFC assessment typically adopts one of the following work classifications: sedentary, light, medium, heavy, and very heavy.  20 C.F.R. § 404.1567.  Medium work is defined as "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds."  Id. § 404.1567(c).  Light work involves "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds."  Id. § 404.1567(b).  Sedentary work is defined as "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties."  Id. § 404.1567(a).

404.1567(c) ("If someone can do medium work, we determine that he or she can also do sedentary and light work."); *See also Anderson v. Comm'r of Soc. Sec.*, 406 F. App'x 32, 36 (6th Cir. 2010) ("A person who has a residual capacity for light work generally also can perform sedentary work.") *quoting Johnson v. Barnhart,* 2005 WL 3271953 (W.D.Wisc. Nov. 29, 2005); *Bradford v. Sec'y of Dep't of Health & Human Servs.*, 803 F.2d 871, 874 (6th Cir. 1986) (stating that "by definition" a claimant who could perform medium work could also perform sedentary work). Thus, despite the lack of consistency complained of by Linderman, the VE's testimony can still provide substantial evidence to support the ALJ's determination that Linderman could perform her past work.

The VE affirmatively testified that a hypothetical individual could perform Linderman's past work with the same RFC limitations at a medium level of exertion. It can be properly inferred that the same hypothetical individual could perform Linderman's past work at a lesser exertional level (i.e, sedentary). It should be noted that Linderman does not object to the RFC determination, only that the RFC did not precisely match one of the hypothetical questions to the VE. ECF Doc. No. 13, Page ID# 957-58. However, the Sixth Circuit has held that it is not reversible error to rely on a hypothetical question that does not match the RFC, when the hypothetical is more restrictive than the RFC. *Pasco v. Comm'r of Soc. Sec.*, 137 F. App'x 828, 845 (6th Cir. 2005) (holding that the VE testimony that the hypothetical individual could perform light work could serve as substantial evidence to support the ALJ's RFC determination that the same individual could perform work at a higher exertional level); *See also Allen v. Colvin*, No. 3:10-CV-01024, 2014 WL 1775564, at *25 (M.D. Tenn. Apr. 29, 2014) ("It is notable, but does not constitute reversible error, that the plaintiff's RFC does not precisely match the hypothetical question that the ALJ posed to the VE because the limitations identified by the

29

ALJ in this hypothetical question are more limiting than the plaintiff's RFC.") Remand is not warranted under the facts of this case simply because the RFC did not precisely match the hypothetical.

## VII.    Recommendations

Because Linderman has not demonstrated any error in the Commissioner's application of legal standards and because the findings of the ALJ were supported by substantial evidence, I recommend that the final decision of the Commissioner be AFFIRMED, pursuant to 42 U.S.C. §405(g).

Dated: April 6, 2017

Thomas M. Parker
United States Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  See *U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981).  See also *Thomas v. Arn,* 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986).